**Decided May 22, 1986**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

JUAN T. LIZAMA, et al.,          )     CIVIL ACTION NO. 85-0011
                                 )
              Plaintiffs,        )
                                 )
        vs.                      )
                                 )
JOSE S. RIOS, individually       )
and as Mayor of Saipan,          )
                                 )
              Defendant,         )     DECISION AND ORDER
_____)
                                 )
JOSE S. RIOS,                    )
                                 )
     Third-Party Plaintiff,      )
                                 )
        vs.                      )          F I L E D
                                 )            Clerk
MARIANAS PUBLIC LAND CORPO-      )        District Court
RATION, et al.,                  )
                                 )         MAY 2 2 1986
     Third-Party Defendants,     )
                                 )   For The Northern Mariana Islands
MARIANAS PUBLIC LAND TRUST,      )   By_____
                                 )          (Deputy Clerk)
     Applicant for Intervention. )
_____)

        Plaintiffs, Juan T. Lizama and Jesus T. Lizama, filed a
complaint on August 28, 1985, pursuant to 42 U.S.C. §1983
alleging that defendant, Jose S. Rios, individually and as the
Mayor of Saipan, was interfering with their right to possess Lot
001 D 27 (hereinafter the "Hyatt lot") in violation of the fifth
and Fourteenth Amendments to the United States Constitution.  On
October 17, 1985, Rios counterclaimed[1] under 42 U.S.C. §1983

_____
[1]     Initially, Rios couched this action in terms of a "cross-
claim" but he later amended it to read "counterclaim."

569

against the Lizamas joining the Marianas Public Land Corporation and its officers (hereinafter collectively referred to as MPLC) alleging that MPLC violated the Fourteenth Amendment by treating Rios and others arbitrarily and capriciously when it exchanged public lands without notice and a hearing. The counterclaim further alleged fraud, breach of trust, and a gift of public lands. Rios sought $9,500,000 in compensatory and punitive damages and injunctive and declaratory relief aimed at reversing past exchanges, including the Hyatt exchange, and preventing future similar exchanges. On January 6, 1986, Rios filed a motion for summary judgment on his counterclaim. On January 15, 1986, the Lizamas filed a motion to dismiss the counterclaim. On March 11, 1986, Rios and MPLC entered into a stipulated permanent injunction in which MPLC agreed to adopt regulations and procedures to insure that future exchanges resulted in equal exchanges of land values. Pursuant to this stipulation, Rios dropped his claims against MPLC. After care- fully considering the moving papers and the arguments of both counsel the Court now denies both motions for the reasons stated herein.

Prior to July 25, 1984, MPLC held title to the Hyatt lot. On several occasions Rios attempted to acquire title to this lot; however, MPLC informed him that the lot was not available for sale or exchange. Rios then sought, and on October 14, 1982, obtained, a license from MPLC to clear, clean, and maintain the Hyatt lot.

On July 25, 1984, MPLC exchanged the Hyatt lot for two

lots on Tinian owned by the Lizamas. At all relevant times, Juan T. Lizama, plaintiff and counter-defendant herein, served as legal counsel to MPLC.

Rios was informed by a letter dated August 7, 1984, from Jesus G. Villagomez, Executive Director of MPLC, that the exchange had been consummated and that his license was terminated. Rios refused to vacate the Hyatt lot. This action followed.

The Lizamas now move to dismiss Rios' counterclaim based on their assertion that he lacks standing. Rios claims he has standing in his capacity as a taxpayer and as a beneficiary of a public trust. He bases this claim on both general principles of law and Amendment 31 to the Commonwealth of the Northern Mariana Islands Constitution.

## I.  MOTION TO DISMISS

### a.  Taxpayer's Standing

The Lizamas' motion to dismiss is grounded on the general rule adhered to by federal courts in federal taxpayer lawsuits that federal taxpayers do not have standing to challenge expenditures of federal funds. United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). This rule is premised on Article III of the United States Constitution which grants federal courts jurisdiction to adjudicate suits involving actual cases or controversies. Id. 94 S.Ct. at 2943. The federal courts have consistently held that the interest of a

federal taxpayer in federal monies is infinitesimal and the effect on a single taxpayer of monies spent does not rise to a level that would support a finding of the requisite direct injury necessary to establish a case or controversy. Massachusetts v. Melon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

Unlike federal taxpayers, municipal taxpayers may sue to enjoin municipal corporations from illegally expending public funds. Id. 43 S.Ct. at 601. In this situation the taxpayers' interest is direct and immediate. Id. The Ninth Circuit has adopted this reasoning in Reynolds v. Wade, 249 F.2d 73 (9th Cir. 1957). In Reynolds, an Alaskan taxpayer sued to enjoin Alaskan officials from making alleged unlawful expenditures of territorial funds. The District Court of Alaska dismissed the action finding that the taxpayer lacked standing. The Ninth Circuit reversed, reasoning that although a federal taxpayer, who is one in 160 million, does not have standing to challenge federal expenditures, an Alaskan taxpayer, who is one in 130,000, does. Id.

This reasoning is even more compelling here in the Commonwealth which has only a fraction of the taxpayers that existed in Alaska in 1957. Both the Commonwealth Trial Court and this Court's appellate division have previously held that Commonwealth taxpayers have standing to sue. See Romisher v. MPLC, Civ.No. 83-401 (Tr.Ct. Decision filed Nov. 25, 1983); and Manglona v. Camacho, DCA No. 82-9009 (D.N.M.I.(App.Div.) Nov. 10, 1983). The Lizamas have not presented this Court with any reason

572

to retreat from these precedents.

The Lizamas contend that there was no expenditure of public funds, merely an exchange of public lands, and therefore there is no basis for a taxpayer action. Where a municipality surrenders something of value to the detriment of its taxpayers, a taxpayer action is appropriate. In re Cole's Estate, 102 Wis. 1, 78 N.W. 402 (1899). In Cole's Estate, Cole bequeathed a life estate in his property to his wife and son, the remainder to the town of Watertown. When the trustees, officials of Watertown, sold a portion of the property to cover administrative and repair costs, a taxpayer sued to recover the property. The court found that there was standing despite the fact that no municipal funds had been expended and that in fact the property had been received as a gift. Id. 78 N.W. at 404. Here too, though arguably no public funds are lost when, as Rios alleges, MPLC exchanges public lands for private lands of lesser value, ultimately there is harm suffered by the taxpayers and one which this Court will address.

### b. Beneficiary Standing

Rios claims standing as a beneficiary of a public trust. Article XI, §4, of the Commonwealth Constitution establishes MPLC for the "benefit of the people of the Commonwealth who are of Northern Marianas descent."

The Lizamas argue that Rios does not have standing as a beneficiary of a trust to bring this action. The Lizamas concede

that MPLC holds public lands in trust for the people of the Commonwealth who are of Northern Marianas descent. See, Memorandum of Law in Support of Plaintiffs' Motion to Dismiss Counterclaimants' Counterclaim, at p. 7. However, they contend that the trust is a public trust and, according to the Lizamas, a beneficiary of a public trust cannot sue for breach of a fiduciary duty absent a showing of a particularized injury different in kind from that suffered by the public at large. See, e.g., Burgess v. M/V Tamano, 370 F.Supp. 247 (1973).

Though this was the general rule, this concept was eroded in United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 7 L.Ed.2d 580 (1983). In Mitchell, the Quinault Indian Tribe and individual Indians brought suit seeking damages for alleged mismanagement of Indian timber lands claiming that the mismanagement constituted a breach of the fiduciary duty owed to the Indians by the United States as trustee of the lands. Mitchell involved a series of agreements between the United States, through the Secretary of the Interior, and the Quinault Indian Tribe. These agreements provided that the Secretary of the Interior would manage the timber resources on Indian lands for the benefit of the Indians. Management of these resources included cutting down the timber, removing it from the land, and selling it. The Secretary was required to manage the timber resources in a manner which would yield the greatest revenue for the Indians. The proceeds from the timber sales were to be used for the benefit of the Indians. The Secretary of the Interior

exercised daily supervision over the harvesting and management of the timber and was authorized to collect reasonable fees from the timber sales to cover the costs incurred in the management and sale of the timber.  Id.

The plaintiff's suit in Mitchell alleged, inter alia, that in its management of the timber the Secretary, in some cases, had failed to obtain the fair market value for the timber and, in others, had failed to obtain any payment at all.  The Indians sought monetary damages to compensate them for these past wrongs.

The United States Supreme Court had little difficulty in applying general trust law and finding a trust existed.  As the Court pointed out, the Secretary had full responsibility to manage the Indians' resources for their benefit and this in itself established a fiduciary relationship which necessarily arises when the government assumes such elaborate control over the property of the Indians.  Id.  "All of the necessary elements of a common-law trust [were] present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands and funds)."  Id. 103 S.Ct. at 2972.

The only remaining issue for the Mitchell court was the question of compensation.  The court concluded that "[g]iven the existence of a trust relationship, it naturally follows that the Government should be liable in damages for breaches of a trust."  Id. (citations omitted).  The Court further noted that a fundamental incident of a trust relationship was the "right of an

injured beneficiary to sue the trustee for damages resulting from a breach of a trust." Id. (footnote omitted).

The facts in Mitchell are aligned with the facts herein. MPLC was established to manage and dispose of public lands for the "benefit of the people of the Commonwealth who are of Northern Marianas descent." CNMI Const., Art. XI. As pointed out supra, the Lizamas do not question the existence of a trust, they challenge Rios' ability to redress alleged wrongs by the trustee. The Court follows the reasoning in Mitchell and now holds that beneficiaries of a public trust have the right to sue the trustee to redress alleged wrongs committed in breach of the trust. This furthers the purpose of the trust which is to manage the public lands in the best interests of the beneficiaries. Without granting Rios, and others similarly situated, the opportunity to challenge alleged wrongs MPLC would be left to squander public lands leaving the beneficiaries no recourse in the courts. That defeats the purpose of MPLC and violates the very nature of a "trust." Where a breach of a trust is alleged the Court will not allow the trustees to use the existence of a public trust as a shield to preclude the beneficiaries - the very persons for whom the trust was established - from challenging such actions.

Rios also asserts that he has standing based on Amendment 31 to the Commonwealth Constitution. This amendment, entitled, "Taxpayer's Right of Action," specifically provides for taxpayer's standing where there has been an expenditure of public funds for other than public purposes or for a breach of a fiduci-

ary duty. Though Amendment 31 came into effect after Rios' counterclaim was filed, Rios argues it should be applied retroactively. Lizama argues it should be applied prospectively only. Because there are sufficient grounds for standing based on Rios' status as a taxpayer and as a beneficiary the Court need not now address the question of the retroactivity of amendment 31. For these reasons the Lizamas' motion to dismiss Rios' counterclaim is denied.

## II. MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that a court shall render summary judgment in favor of the moving party:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing version of the truth." Admiralty Fund v. Jones, 677 F.2d 1289, 1293 (9th Cir. 1982)(citation omitted).

Rios' counterclaim contains three counts: (1) violation of equal protection and due process rights; (2) fraud; and (3) gift of public funds. The first count charges that MPLC has no criteria or standards for exchanges and that consequently the exchanges are conducted in an arbitrary and capricious manner. In addition, Rios alleges that MPLC gave special consideration to

the Lizamas because Juan Lizama was its employee and that the executive director authorized the exchange on his own when the entire board of directors should have been consulted. These acts, according to Rios, were the result of a conspiracy between MPLC and the Lizamas. These assertions are supported by affidavits filed by Rios and his attorney, Robert J. O'Connor. The O'Connor affidavit sets out excerpts from conversations he had with Executive Director Villagomez in which Villagomez purportedly told O'Connor that he went to the board of directors on behalf of Juan Lizama to effectuate the Hyatt exchange. The affidavit further sets out a conversation O'Connor had with Lizama in which Lizama told O'Connor that the Lizamas received the Hyatt lot because Juan worked for MPLC.

Filed with Lizamas' opposition to Rios' motion for summary judgment are affidavits of Juan Lizama and Jesus Villagomez. In his affidavit Juan Lizama states that he was never involved directly or indirectly with the board's decision to exchange his land. This counters Rios' allegation of a conspiracy between Lizama and MPLC. When reviewing the record on a motion for summary judgment the court views the evidence in a light most favorable to the party opposing the motion. Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). In this light, there exists a question of fact as to the existence of a conspiracy between MPLC and Juan Lizama.

O'Connor's affidavit states that Villagomez told

578

O'Connor that he went to the board seeking the Hyatt Lot "for Juan." A subsequent declaration of O'Connor recites questions posed to Jesus Villagomez and responses made by him during a deposition. This declaration indicates that Villagomez stated that MPLC had no rules or regulations and that it did not appraise lots before it exchanged them. Attached to Lizamas' opposition to this motion is Villagomez' affidavit which, after stating that MPLC has policies and procedures for land exchanges, sets them out. These conflicting affidavits present material questions of fact that can only be resolved in trial, making summary judgment inappropriate.

Rios' second count, fraud, is based on his assertion that MPLC caused the dissipation of public lands when it exchanged lands without appraisals. Attached to Rios' reply brief in support of his motion for summary judgment is a declaration by Manuel A. Sablan, a certified real estate appraiser, who opines that the Lizamas' land is worth between $7,300 and $16,400 and the Hyatt lot is worth between $31,400 and $42,800. Villagomez' affidavit states that MPLC offered the Lizamas $5.00 per square meter for the Lizamas' 6,000-plus square meters of land. Accordingly, the value MPLC had placed on the Lizamas' land was in excess of $30,000. Villagomez' affidavit sets out several factors that were taken into consideration when exchanging lands. First, MPLC had an obligation to acquire these lands. Also, due to the scarcity of land in the Commonwealth, MPLC had a policy of exchanging lands on a one-to-one basis.

579

There remains a question of fact as to the value of the lands exchanged in the Lizama exchange. A further question of fact, assuming the exchange values were disproportionate, is whether an unequal exchange was justified by the limitations imposed on MPLC combined with its policy to preserve the greatest amount of land possible.

The final count of Rios' counterclaim is that by exchanging public lands of significantly greater value than the private lands it received MPLC has made a gift of public lands. As set out above, there is still an issue of the value of the lands exchanged and this issue must be resolved at trial.

For these reasons, the Lizamas' motion to dismiss Rios' counterclaim is denied as is Rios' motion for summary judgment.

IT IS SO ORDERED.

DATED this _22nd_ day of May, 1986.

_____

JUDGE ALFRED LAURETA